IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2009 DEC -7  P 4: 35

CLERK _C Caldwell_
SO. DIST. OF GA.

RAYONIER PERFORMANCE FIBERS
LLC,

                Plaintiff,

    vs.

MING TAI CHEMICAL CO. LTD.,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case Number: **CV209- 191**

## NOTICE OF REMOVAL OF CIVIL ACTION

To the Honorable Judges of the United States District Court for the Southern District of Georgia,

Brunswick Division:

       COMES NOW defendant MING TAI CHEMICAL CO. LTD in the above matter and files

this its Notice of Removal and respectfully shows the Court the following, to-wit:

1.  The above-entitled action was commenced in the Wayne County Superior Court, the same

    being Civil Action Number 09CV0330, on April 22, 2009, and is now pending in that court.

2.  The above-mentioned action is a civil action for breach of contract.

3.  Removing party is the sole defendant named in the action.

4.  The action is one of which the United States District Courts are given original jurisdiction by

    reason of the diversity of citizenship of the parties.

5.  The amount in controversy in the action, exclusive of interest and costs, exceeds $75,000.00.

6.  A Summons and Amended Complaint addressed to Room 704, 7th Floor, 142, Sec. 2,

    Chang-An East Road, Taipei, Taiwan, were delivered to removing party on November 9,

    2009.

7.  Thirty days have not yet expired since the action became removable to this Court.

8. At the time of the commencement of the action, Plaintiff was and now is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 50 North Laura Street, Jacksonville, Florida; at the time of the commencement of this action, removing party was and now is a corporation organized and existing under the laws of Taiwan.

9. Based on the Amended Complaint and the diverse citizenship of the parties, this Court therefore has original jurisdiction of this action under 28 U.S.C. § 1332 and, because Defendant is not a citizen or resident of the State of Georgia, in which state this action is now pending, removal of the action to this Court is proper under 28 U.S.C. § 1441(a).

10. Copies of all pleadings, process, and orders delivered to removing party in this action are attached to this Notice and marked Exhibit A.

11. Pursuant to 28 U.S.C. § 1446(d), after this Notice is filed, removing party shall give written notice thereof to Plaintiff's attorney and to the Wayne County Superior Court.

RESPECTFULLY SUBMITTED this the  day of December, 2009.

John A. Kithas
California Bar Number 64284
LAW OFFICES OF JOHN A. KITHAS

John A. Kithas
California Bar Number 64284

One Embarcadero Center, Suite 1020
San Francisco, CA  94111
(415) 788-8100
(415) 788-8001 FAX
jkithas@aol.com

---

NOTICE OF REMOVAL                                      Page - 2 -

1

2    BROWN, READDICK, BUMGARTNER,
     CARTER, STRICKLAND & WATKINS, LLP

3

4    _____
     G. Todd Carter
5    Georgia Bar Number 113601

6    5 Glynn Avenue
     Post Office Box 220
7    Brunswick, GA 31521
     (912) 264-8544
8    (912) 264-9667
     tcarter@brbcsw.com
9

10   **Attorneys for Defendant Ming Tai**
11   **Chemical Co., Ltd.**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

NOTICE OF REMOVAL                                Page - 3 -

STATE OF GEORGIA

COUNTY OF GLYNN

I, G. TODD CARTER, being first duly sworn, state that I am an attorney for the defendant in the foregoing Notice; that I have prepared and read the foregoing Notice; and that the matters set forth and contained therein are true and correct to the best of my knowledge and belief.

_____ (SEAL)
G. Todd Carter

Sworn to and subscribed before me this
___7___ day of December, 2009.

_____
Notary Public

My Commission Expires: _6/1/2013_

(SEAL OF NOTARY)

NOTICE OF REMOVAL                                      Page - 4 -

# EXHIBIT "A"

IN THE SUPERIOR COURT OF WAYNE COUNTY

STATE OF GEORGIA

RAYONIER PERFORMANCE FIBERS, LLC, )
                                   )
                Plaintiff,         )
                                   )
          vs.                      )          CIVIL ACTION NO. 09CV0330
                                   )
MING TAI CHEMICAL CO., LTD.,       )
                                   )
                Defendant.         )

## SUMMONS

TO:  **Ming Tai Chemical Co., Ltd.**
     **c/o Mark H. Chen, its President**
     Room 704, 7th Floor, 142, Sec. 2
     Chang-An East Road
     Taipei, Taiwan

YOU ARE HEREBY SUMMONED and required to file with the Clerk of said Court and serve upon James B. Durham, of Durham, McHugh & Duncan, P.C., whose address is 777 Gloucester Street, Suite 300, Post Office Box 2177, Brunswick, Georgia, 31521, appropriate defensive pleadings to the Complaint which is herewith served upon you within thirty (30) days after service of this Summons on you, exclusive of the date of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded by the Complaint.

DATED this _3_ day of June, 2009.

_____
Clerk, Superior Court of Wayne County, Georgia

IN THE SUPERIOR COURT OF WAYNE COUNTY

STATE OF GEORGIA

RAYONIER PERFORMANCE FIBERS, LLC, )
                                  )
       Plaintiff,            )
                                    )
    vs.                     )        CIVIL ACTION NO. 09CV0330
                                    )
MING TAI CHEMICAL CO., LTD.,   )
                                    )
       Defendant.         )

## MOTION FOR ISSUANCE OF LETTERS ROGATORY

COMES NOW Plaintiff, Rayonier Performance Fibers, LLC, and moves the Court to issue a

Request for International Judicial Assistance (Letters Rogatory) directed to the Appropriate Judicial

Authority of Taiwan in the above-styled action, and in support hereof shows the following:

This action was initiated by the filing of the Plaintiff's Complaint for damages on or about

April 22, 2009, and its Amended Complaint filed contemporaneously herewith, and is based upon

a breach of contract claim. Defendant, Ming Tai Chemical Co., Ltd., is a foreign corporation and

has entered into multiple contracts with the Plaintiff in which the Plaintiff supplies the Defendant

with certain pulp products. Plaintiff has been supplying pulp products to the Defendant for more

than twenty (20) years. Defendant transacted business within the State of Georgia and is subject to

the jurisdiction of this Court under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91. The parties

entered into a contract in April, 2008, in which Defendant agreed to purchase a minimum amount

of pulp products from Plaintiff for the years 2008 through 2012. Defendant has failed to purchase

products as required by the contract and has, therefore, breached the contract. In addition, Defendant has informed Plaintiff that it desires to break the contract.

Defendant is a foreign corporation headquartered in Taiwan. Because Taiwan is not a signatory to the Hague Convention, the Defendant must be served pursuant to the judicial procedures of Taiwan. In accordance with the judicial procedures for Taiwan, in order to effect service of process on Defendant it is necessary to obtain Letters Rogatory from this Court to present to the Department of State, Office of Overseas Citizens Services, who will then forward it with the Summons and Complaint through the appropriate channels to be served on the Defendant in Taiwan.

WHEREFORE, Plaintiff prays that this Court issue a Request for International Judicial Assistance (Letters Rogatory) directed to the Appropriate Judicial Authority of Taiwan.

Respectfully submitted, this 2nd day of June, 2009.

_____

JAMES B. DURHAM
Georgia State Bar No. 235526
AUDRA L. RIZZI
Georgia State Bar No. 607575
Attorneys for Plaintiff

DURHAM, McHUGH & DUNCAN, P.C.
Post Office Box 2177
Brunswick, Georgia 31521-2177
(912)264-1800

IN THE SUPERIOR COURT OF WAYNE COUNTY
STATE OF GEORGIA
UNITED STATES OF AMERICA

| | |
|---|---|
| RAYONIER PERFORMANCE FIBERS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 09CV0330 |
| ) | |
| MING TAI CHEMICAL CO., LTD., ) | |
| ) | |
| Defendant. ) | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTERS ROGATORY)

## TO:  THE APPROPRIATE JUDICIAL AUTHORITY OF TAIWAN

The Superior Court of Wayne County, Georgia, U.S.A., presents its compliments to the Appropriate Judicial Authority of Taiwan, and requests international judicial assistance to effect service of process to be used in a civil proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Appropriate Judicial Authority of Taiwan effect service of process upon the below named individuals:

Mr. Mark H. Chen, President
Ming Tai Chemical Co., Ltd.
Room 704, 7th Floor, 142, Sec. 2
Chang-An East Road
Taipei, Taiwan

The facts of the case pending before this Court is that Plaintiff, Rayonier Performance Fibers, LLC, has been supplying products to the Defendant, Ming Tai Chemical Co., Ltd., for more than

twenty (20) years. Defendant transacted business within the State of Georgia and is subject to the

jurisdiction of this Court under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91. The subject

matter of this litigation is a contract entered into by the parties in April, 2008, in which Defendant

agreed to purchase a minimum amount of pulp products from Plaintiff for the years 2008 through

2012. Defendant has failed to purchase products as required by the contract and has, therefore,

breached the contract. In addition, Defendant has informed Plaintiff that it desires to break the

contract.

This Court is willing to provide similar assistance to the judicial authorities of Taiwan.

Counsel for Plaintiff is willing to reimburse the Appropriate Judicial Authorities of Taiwan

for costs incurred in executing this Court's Letters Rogatory. Counsel for Plaintiff may be contacted

at the following address:

James B. Durham, Esq.
Durham, McHugh & Duncan, P.C.
777 Gloucester Street, Suite 300
Brunswick, Georgia, USA 31520
Phone: (912)264-1800
Fax: (912)264-4480

This _____ day of June, 2009.


                                        _____
                                        STEPHEN G. SCARLETT, Judge
                                        Superior Court of Wayne County, Georgia, USA
                                        Brunswick Judicial Circuit

IN THE SUPERIOR COURT OF WAYNE COUNTY

STATE OF GEORGIA

RAYONIER PERFORMANCE FIBERS, LLC, )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )          CIVIL ACTION NO. 09CV0330
                                  )
MING TAI CHEMICAL CO., LTD.,      )
                                  )
          Defendant.              )

## AMENDED COMPLAINT

COMES NOW the Plaintiff, Rayonier Performance Fibers, LLC (hereinafter referred to as "Plaintiff"), and files this its Complaint against Defendant, Ming Tai Chemical Co., Ltd. (hereinafter referred to as "Defendant"), and alleges as follows:

1.   Plaintiff is organized under the laws of the State of Delaware, with its principal place of business at 50 North Laura Street, Suite 1900, Jacksonville, Florida, and operates a pulp mill in Jesup, Wayne County, Georgia.

2.   Defendant is a foreign corporation and has entered into multiple contracts with the Plaintiff in which the Plaintiff supplies the Defendant with certain pulp products.

3.   Plaintiff has been supplying pulp products to the Defendant for more than twenty (20) years.

4.   On multiple occasions during their business relationship, representatives of the Defendant have visited the Plaintiff's mill in Jesup to discuss pricing, performance allowances,

freight rates, review of the Jesup mill production process, and/or other matters pertaining to the negotiation of existing and/or future contracts.

5.     Defendant transmits all its orders for products from Plaintiff to Plaintiff's Marketing and Research Center, located in Jesup, Wayne County, Georgia.

6.     All orders from Defendant are accepted and confirmed by Plaintiff at its Marketing and Research Center, located in Jesup, Wayne County, Georgia.

7.     Plaintiff produces all of the pulp for the Defendant at its pulp mills in Jesup, Georgia, and Fernandina Beach, Florida.

8.     Pursuant to a Cellulose Specialities Agreement entered into between the parties (hereinafter referred to as the "Contract"), the Defendant reserved the right to audit and inspect the Plaintiff's records, located in Jesup, Wayne County, Georgia, to verify the correctness of the Plaintiff's calculation of changes and the weighted average price. A copy of the Contract is attached hereto as Exhibit "1."

9.     Pursuant to the General Terms of Sale, attached as Exhibit A to the contract, the contract entered into between the parties is to be interpreted and construed in accordance with the laws of the State of Georgia.

10.     The Defendant, having transacted business within the State of Georgia, is subject to the jurisdiction of this Court under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91, and may be served at Room 704, 7th Floor, 142, Sec. 2, Chang-An E. Road, Taipei, Taiwan, Telephone (886)2-27513516.

11.     Venue is proper in this Court pursuant to O.C.G.A. § 9-10-93.

## BREACH OF CONTRACT

12.    Plaintiff and Defendant entered the Contract that is the subject matter of this litigation on or about April 7, 2008.

13.    Pursuant to the Contract, the Defendant agreed to purchase a minimum amount of pulp products from the Plaintiff for the years 2008 through 2012.

14.    Specifically, Defendant agreed to purchase from Plaintiff during the period of 2009 through 2012 a minimum of 3,500 air-dry metric tons of Ultranier-J wood pulp and 3,500 air-dry metric tons of Amelianier-F wood pulp each calendar year.

15.    Pursuant to the Contract, the volume was to be spread in approximate equal quarterly shipments.

16.    To date for the calendar year 2009, the Defendant has purchased no Ultranier-J and no Amelianier-F as required by the Contract.

17.    The Defendant's failure to purchase Ultranier-J and Amelianier-F as required by the Contract constitutes a breach of the Contract and has damaged the Plaintiff.

18.    Pursuant to paragraph 4 of the Contract, the 2009 formula price sets forth the amount the Defendant owes Plaintiff for the amount of pulp product that Defendant should have purchased for the first quarter of 2009, as well as for the remainder of 2009.

19.    The Defendant is also obligated to purchase a minimum amount of pulp products from the Plaintiff for the calendar years 2010, 2011, and 2012.

20.    The Defendant has informed the Plaintiff that it does not intend to purchase any more pulp products at the prices stated under the Contract and desires to break the Contract.

21.    Because the Defendant has not purchased any pulp products as required by the Contract for 2009 and has stated it has no intention of purchasing pulp products at the agreed upon prices for the remainder of the term of the Contract, the Defendant has breached the Contract for years 2009, 2010, 2011, and 2012.

22.    Because the Defendant has breached its Contract with Plaintiff, the Plaintiff is entitled to recover all minimum amounts that should have been purchased by the Defendant pursuant to the terms of the Contract.

23.    The Defendant's failure to purchase the required minimum pulp products under the Contract constitutes a breach of the Contract for which the Plaintiff is entitled to recover damages.

24.    As a result of the Defendant's breach of the Contract, the Plaintiff is entitled to recover all reasonable attorney's fees, expenses, and costs associated with the Plaintiff having to file this action and attempt to collect monies owed pursuant to the Contract.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a)    For damages for breach of contract calculated pursuant to the terms of the Contract;

(b)    For attorney's fees and expenses incurred by Plaintiff in enforcing the terms of the Contract;

(c)    For judgment for the costs of this action;

(d)    For trial by a jury of twelve; and

(e)    For such other and further relief as the Court may deem just and proper.

Respectfully submitted, this 2nd day of June, 2009.

JAMES B. DURHAM
Georgia State Bar No. 235526
AUDRA L. RIZZI
Georgia State Bar No. 607575
Attorneys for Plaintiff

DURHAM, McHUGH & DUNCAN, P.C.
Post Office Box 2177
Brunswick, Georgia 31521-2177
(912)264-1800

## CELLULOSE SPECIALTIES AGREEMENT

**RAYONIER PERFORMANCE FIBERS, LLC,** 4474 Savannah Hwy., Jesup, Georgia 31545 ("Rayonier") agrees to sell, and **MING TAI CHEMICAL CO., LTD.,** Room 704 Union Building, 7th Floor, 142 Sec. 2, Chang An E. Road, Taipei, Taiwan, Republic of China ("Buyer"), agrees to purchase the Products described below, subject to the terms and conditions stated in this Cellulose Specialties Agreement ("Agreement").

1.    **PRODUCT(S)**: Rayonier Ultranier-J, Amelianier-F and other mutually agreed-upon grades of chemical cellulose consistent with Rayonier's standard specifications ("Product").

2.    **TERM**: This Agreement is effective as of January 1, 2008, and shall continue in full force and effect through December 31, 2012.

3.    **QUANTITY AND DELIVERIES**: In 2008 Buyer agrees to purchase a minimum 2,625 air-dry metric tons (ADMT) of Ultranier-J, and 3,500 ADMT of Amelianier-F. During the period 2009 through 2012 Buyer agrees to purchase a minimum 3,500 ADMT of Ultranier-J per year and 3,500 ADMT of Amelianier-F per year. Volume will be spread in approximate equal quarterly shipments. Shipment of Amelianier-F will commence after January 1, 2008. Shipment of Ultranier-J will commence after April 1, 2008

4.    **PRICE AND TERMS**: The price of Product hereunder is $1550/ADMT for Ultranier-J for 2008 and $1440/ADMT for Amelianier-F for 2008. Terms are: CIF Taoyuan net 60 days from Bill of Lading date. The specific quantities, grades, and delivery dates of each individual shipment will be agreed upon between the parties thirty days prior to date of shipment and set forth in Rayonier's Pulp Sales Contract applicable to such shipment; such Pulp Sales Contract shall serve as order confirmation only and shall not alter the terms of this Agreement.

The price for 2009 will be determined as follows: by December 1, 2008 Rayonier will inform Buyer of the estimated price for 2009. This estimated price will be used for all invoices to Buyer in 2009. By January 31, 2010 Rayonier will compare the estimated 2009 price to the 2009 Formula Price (as hereinafter defined). If the estimated 2009 price exceeds the 2009 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2009 price is less than the 2009 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2009 Formula Price" for each Product grade is the sum of Buyer's 2008 price plus the change in Rayonier's Weighted Average Price (the "WAP" as hereinafter defined) from 2008 to 2009.

The price for 2010 will be determined as follows: by December 1, 2009 Rayonier will inform Buyer of the estimated price for 2010. This estimated price will be used for all invoices to Buyer in 2010. By January 31, 2011 Rayonier will compare the estimated 2010 price to the 2010 Formula Price (as hereinafter defined). If the estimated 2010

price exceeds the 2010 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2010 price is less than the 2010 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2010 Formula Price" for each Product grade is the sum of Buyer's 2009 Formula Price plus the change in WAP from 2009 to 2010.

The price for 2011 will be determined as follows: by December 1, 2010 Rayonier will inform Buyer of the estimated price for 2011. This estimated price will be used for all invoices to Buyer in 2011. By January 31, 2012 Rayonier will compare the estimated 2011 price to the 2011 Formula Price (as hereinafter defined). If the estimated 2011 price exceeds the 2011 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2011 price is less than the 2011 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2011 Formula Price" for each Product grade is the sum of Buyer's 2010 Formula Price plus the change in WAP from 2010 to 2011.

The price for 2012 will be determined as follows: by December 1, 2011 Rayonier will inform Buyer of the estimated price for 2012. This estimated price will be used for all invoices to Buyer in 2012. By January 31, 2013 Rayonier will compare the estimated 2012 price to the 2012 Formula Price (as hereinafter defined). If the estimated 2012 price exceeds the 2012 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2012 price is less than the 2012 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2012 Formula Price" for each Product grade is the sum of Buyer's 2011 Formula Price plus the change in WAP from 2011 to 2012.

For purposes of this Agreement, "WAP" is the delivered sales price less surcharges, rebates, allowances, and freight divided by the total sales volume for all Rayonier acetate pulp sales in any calendar year.

5.    **AUDIT RIGHTS:** For prices in 2009 through 2012, Buyer shall have reasonable audit rights regarding the calculation of changes in WAP. Specifically, Buyer may inspect Rayonier's records (via a mutually agreed-upon accounting firm, such agreement upon the accounting firm shall not to be unreasonably withheld or delayed) to verify the correctness of Rayonier's calculations of changes in WAP. The accounting firm making such inspection shall be required to sign a reasonable confidentiality agreement provided by Rayonier and shall report only that Rayonier is in compliance with the pricing mechanism, and if not, the amount of such discrepancy in price. Upon receipt by Rayonier of an accurate report showing such discrepancy, Rayonier shall revise the applicable price charged to Buyer so that such discrepancy no longer exists. Buyer

shall be solely responsible for all expenses associated with such audit, provided, however, that in the event the accounting firm determines there is a discrepancy in Rayonier's calculation of the WAP for any year, and if the aggregate Formula Price for all Product shipped to Buyer during such year, after Rayonier issues any credit/debit memo, exceeds by one percent (1%) the aggregate price that should have been paid for said Product as determined by the accounting firm for said years, Rayonier shall be responsible for the accounting firm's expenses associated with the audit for such period.

6.   **ANNUAL VOLUME REBATE:** Provided Buyer is not in default under this Agreement, Rayonier shall pay Buyer a rebate based upon total aggregate volume purchased as follows:

In 2008 Rayonier shall advance a volume discount of $180/ADMT to Buyer on each invoice based on the assumption that Buyer purchases at least 2,625 ADMT of Ultranier-J, and 3,500 ADMT during 2008. For 2009 through 2012 Rayonier shall advance a volume discount of $180/ADMT to Buyer on each invoice based on the assumption that Buyer purchases at least 3,5000 ADMT of Ultranier-J, and 3,500 ADMT of Amelianier-F per year.

At the end of each year, an adjustment shall be made if the actual volume purchased is less than this amount and Buyer will reimburse Rayonier for any overpayment of rebates by January 31, of the following year.

7.   **CONSTRUCTION OF AGREEMENT:** This Agreement, and all sales of Product made pursuant hereto, are subject to the General Terms of Sale set forth in Exhibit A, all of which are included herein and by reference made a part hereof. The parties anticipate that either Buyer or Rayonier may employ as an administrative matter purchase orders, order confirmations, contracts of sale or other forms which incorporate other provisions which by their terms purport to apply to a sale hereunder. The parties expressly stipulate that only this Agreement shall govern, and that no provisions in any such form shall apply to a sale hereunder, except to confirm an order or identify a specific shipment. This Agreement may be altered or added to only by express agreement in writing signed by Buyer and Rayonier, and no such agreement shall be implied by any act of shipment or acceptance of chemical cellulose.

**MING TAI CHEMICAL CO., LTD**

By: _Hsing Wen Chen_
Name:
Title:  Mark H. Chen
President
April 07, 2008

**RAYONIER PERFORMANCE FIBERS, LLC**

By: _____
Name: Paul G. Boynton
Title:  Sr. V. P., Performance Fibers and Wood Products

Exhibit A

# Rayonier

### GENERAL TERMS OF SALE

**(1) TITLE; DEFINITION OF "PORT OF ENTRY:"** Unless contrary provisions specifically referring to title and/or risk of loss are set forth in the Agreement to which these General Terms of Sale are attached as an exhibit or on the face of any Pulp Sales Contract entered into pursuant thereto, title and risk of loss or damage to all products deliverable hereunder, including Wood Pulp and Chemical Cellulose (hereinafter for convenience called "Cellulose") shall pass to the Buyer, regardless of time, terms or method of payment and without diminution or release of Seller's security interest therein: (i) in the event the terms of sale specified in the applicable Pulp Sales Contract are F.O.B., upon tender of delivery by Seller aboard common carrier at such F.O.B. location; (ii) in the event the terms of sale specified in the applicable Pulp Sales Contract are C. & F., when the relevant shipment is loaded on board the carrying vessel at the Port of Exit; (iii) in the event the terms of sale specified in the applicable Pulp Sales Contract are C.I.F., when the vessel carrying the relevant shipment arrives dockside at the Port of Entry; (iv) in the event the terms of sale specified in the applicable Pulp Sales Contract are Free Terminal, when the relevant shipment is delivered inside such terminal; or (v) in the event the terms of sale specified in the applicable Pulp Sales Contract are F.A.S., upon delivery alongside the carrying vessel at the Port of Exit identified in such terms or on a dock designated and provided by the Buyer at such Port of Exit. As used in these General Terms, "Port of Entry" means the port outside of the United States of America at which the carrying vessel actually docks for purposes of unloading the Cellulose, regardless of whether such port is identified in the C.I.F. terms on the applicable Pulp Sales Contract.

**(2) WEIGHT:** In case of Cellulose "Ton" means "Metric Ton" 1,000 kgs. on an airdry basis (i.e., 90% bone-dry Cellulose by weight and 10% moisture) and usual packaging materials.

**(3) SHIPPING COST AND TAXES:** Unless the terms of sale specified in the applicable Pulp Sales Contract are C.I.F, the Buyer shall pay all insurance costs, and, unless the terms of sale specified in the applicable Pulp Sales Contract are C.I.F. or C. & F., the Buyer shall pay all freight or other shipping costs of any shipment beyond the point at which title passes as specified in paragraph (1). In the event the Buyer's location to which the Cellulose is being shipped is located in the United States of America or Canada, the Buyer shall also pay any sales, use, excise or other tax, imposed or increased by Federal, State, Provincial or other taxing authority (except income, excess profits or social security taxes) resulting in an increase in cost to the Seller above that in effect at the date of the fixing of the price of such shipment. In the event the Buyer's location to which the Cellulose is being shipped is located outside of the United States of America or Canada, the Buyer shall pay all present and future charges after arrival of any shipment at Port of Entry, including, but not limited to, all warehouse charges, import duties, consular fees and charges, tariff charges and taxes imposed by any taxing authority in the Port of Entry or country of destination.

**(4) QUANTITY:** A maximum margin of 10%, more or less, on the quantities shipped is to be allowed for convenience of arranging freighting.

**(5) CLAIMS:** In the event the Buyer's location to which the Cellulose is being shipped is located in the United States of America or Canada, all claims relating to any shipment must be made in writing within two (2) months after arrival of shipment at destination and in no event later than three (3) months after date of shipment from Seller's mill. In the event the Buyer's location to which the Cellulose is being shipped is located outside of the United States of America or Canada, all claims relating to any shipment must be made in writing within three (3) months after arrival of the shipment at Port of Entry. A reasonable quantity of such shipment shall be held intact by Buyer pending examination. No defect or nonconformity in any shipment or installment shall excuse the Buyer from accepting and paying for any shipment or installment as to which no defect or nonconformity shall exist; but the Seller, at its option, may treat default in payment for any shipment or installment as a breach of the entire Agreement to which these General Terms of Sale are attached as an exhibit or as a breach of any Pulp Sales Contract entered into pursuant thereto and pursue its rights as described and referred to in paragraph 10.

**(6) TESTS:** In the event of a dispute as to the moisture content of any Cellulose, a retest shall be made in accordance with the procedures for the "Boring Method" as set forth in "Weighing, Sampling and Testing Pulp for Moisture", Publication T 210 M-86 of the Technical Association of the Pulp and Paper Industry, as revised and corrected in 1986. The Buyer shall, however, pay the invoice for the Cellulose in full, when due, subject to the result of the retest. If the difference in moisture between that described herein or in the applicable Pulp Sales Contract on the one hand and that determined by retesting on the other hand does not exceed 1% moisture, the cost of retesting shall be borne by the Buyer; otherwise, an appropriate adjustment shall be made to the invoice in accordance with the results of the retests and the Seller shall bear the cost of the retest.

**(7) SELLER'S LIABILITY:** Seller warrants that the Cellulose shall comply with the description set out in the applicable Pulp Sales Contract, **BUT MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.** Seller's liability hereunder shall in any case be limited to not exceed the purchase price of the particular delivery giving rise to a claim by the Buyer. Seller shall not be liable for any special, incidental, indirect, punitive or consequential damages, including, but not limited to, loss of use, or loss of profit, breach of contract between Buyer and any third party, negligence or any other cause of action, nor for cost of litigation related thereto.

**(8) CONTINGENCIES:** In the event of any contingency preventing or substantially interfering with the production, shipment or delivery of the products deliverable hereunder, including but not limited to such contingencies as fire, accident, sabotage, act of war or the public enemy, uprising, riot, restraint by any government, regulation, rule or order (whether or not actually valid) of any governmental agency or authority, the fixing of price ceilings on any products deliverable hereunder by a governmental agency or authority below prices agreed to for such products by the Seller and the Buyer, strike, sitdown, lockout, labor dispute, shortage of labor, fuel, power or raw materials, embargo, restriction or scarcity of transportation facilities, act of God or other cause beyond the control of either party, restrictions as to contracts, materials and shipping, and allocations or priorities, the Seller shall be under no obligation during such contingency to make shipments if the contingency shall be one immediately affecting the Seller and the shipments which otherwise would have been made during such period shall be canceled unless the Buyer and Seller otherwise mutually agree. If the contingency shall be one immediately affecting the Buyer, the Buyer shall be under no obligation during the period thereof to accept shipments except such as have been delivered to common carrier prior to the receipt by the Seller of notice from the Buyer of such contingency. If any such contingency shall cause only partial interruption, shipments and acceptances thereof shall be correspondingly reduced. In case of any shortage of the Seller's supply of products deliverable hereunder or transportation by reason of any such contingency, the Seller may distribute its production and supply among its customers in such proportions and among such of its customers as the Seller, in its discretion, may determine. Upon the termination of any such contingency, the obligation of the parties hereunder shall (except as herein otherwise provided) again become fully effective with respect to products, the date for shipment of which have not passed.

**(9) SOURCE OF SHIPMENT:** Seller reserves the right at all times to determine or change the mill or mills of Seller, or of its subsidiaries, from which shipments may be made of products deliverable hereunder.

**(10) DEFAULTS:** If the Buyer shall be in default for fifteen (15) days in payment due, or if the Buyer shall default in the performance of any other obligation, term or condition hereof, of the Agreement to which these General Terms of Sale are attached as an exhibit

or of any Pulp Sales Contract entered into pursuant thereto, or if the Buyer or the Seller shall become insolvent, admit in writing its inability to pay its debts as they mature, file a petition in proceedings in bankruptcy or insolvency or for reorganization or liquidation or relief under any bankruptcy, insolvency or debtor laws, make an assignment for the benefit of creditors, consent to the appointment of a receiver of it or of any substantial part of its property, be adjudicated a bankrupt or insolvent on a petition filed against it in bankruptcy or under insolvency or debtor laws, or if an order shall be made by any court appointing a receiver of either Buyer or Seller or of any substantial part of the property of either, or if any court shall assume custody or control of either the Buyer or Seller or of any substantial part of the property of either; then, and in any such event, the non-defaulting party may, at its option, without demand or notice of any kind and without prejudice to any other remedies afforded it under the Uniform Commercial Code, under any other applicable law or otherwise, either suspend performance hereunder during the continuance of such event (in which event, if the non-defaulting party elects, the Agreement to which these General Terms of Sale are attached as an exhibit and/or any Pulp Sales Contract entered into pursuant thereto shall be deemed extended for a period of time equal to that during which performance has been suspended) or terminate the Agreement to which these General Terms of Sale are attached as an exhibit, any Pulp Sales Contract entered into pursuant thereto and/or any other contracts with the defaulting party without prejudice to any right of action for damages against the defaulting party.

(11)  ASSIGNMENT:  The agreement to which these General Terms of Sale are attached as an exhibit and each Pulp Sales Contract entered into pursuant thereto shall bind the respective successors and assigns of the parties thereto, but none of Buyer's rights or obligations thereunder may be assigned without the Seller's prior written consent, except to a subsidiary or affiliated corporation of the Buyer, provided that such assignment shall not relieve the assignor of its obligation thereunder.  Any such assignment without the Seller's written consent shall be void.

(12)  SEVERABILITY:  If any provision herein is or becomes invalid or illegal in whole or in part, such provision shall be deemed amended, as nearly as possible, to be consistent with the intent expressed herein, in the Agreement to which these General Terms of Sale are attached as an exhibit, and any applicable Pulp Sales Contract entered into pursuant thereto, and if such is impossible, that provision shall fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal.

(13)  NOTICE:  Any notice shall be sufficiently given when duly mailed, registered or certified mail, return receipt requested, postage prepaid, addressed to Seller at 4470 Savannah Highway, P.O.Box 2070, Jesup, Georgia 31598, U.S.A., Attention: Vice President, Pulp Marketing, and to Buyer at its address appearing in the Agreement to which these General Terms are attached as an exhibit, or to such other address for either party as that party may by proper notice designate.

(14)  GOVERNING LAWS:  These General Terms of Sale, the Agreement to which they are attached as an exhibit and each Pulp Sale Contract entered into pursuant thereto shall be interpreted and construed in accordance with the laws of the State of Georgia, U.S.A. The application of the U.N. Convention on Contracts for the International Sale of Goods is expressly excluded.

(15)  COMPLIANCE WITH FEDERAL LAW:  When producing in the United States of America the products deliverable under the Agreement to which these General Terms of Sale are attached as an exhibit and any Pulp Sale Contract entered into pursuant thereto, the Seller shall comply with the Fair Labor Standard Act of 1938, as amended, and Title VII of the Civil Rights Act of 1964, as amended.

(16)  DELAY NO CAUSE FOR REFUSAL:  Notwithstanding anything contained herein, in the event of a carrier or vessel being delayed in arriving at Buyer's location to which the Cellulose is being shipped or to any foreign Port of Entry, through no fault of Seller, beyond the estimated time of arrival (ETA), such delay shall not by itself constitute a cause for refusal of the shipment by the Buyer.

IN THE SUPERIOR COURT OF WAYNE COUNTY

STATE OF GEORGIA

RAYONIER PERFORMANCE FIBERS, LLC, )
                                   )
         Plaintiff,                )
                                     )
    vs.                         )    CIVIL ACTION NO. 09CV0330
                                     )
MING TAI CHEMICAL CO., LTD.,     )
                                     )
        Defendant.             )

## COMPLAINT

COMES NOW the Plaintiff, Rayonier Performance Fibers, LLC (hereinafter referred to as "Plaintiff"), and files this its Complaint against Defendant, Ming Tai Chemical Co., Ltd. (hereinafter referred to as "Defendant"), and alleges as follows:

1.    Plaintiff is organized under the laws of the State of Delaware, with its principal place of business at 50 North Laura Street, Suite 1900, Jacksonville, Florida, and operates a pulp mill in Jesup, Wayne County, Georgia.

2.    Defendant is a foreign corporation and has entered into multiple contracts with the Plaintiff in which the Plaintiff supplies the Defendant with certain pulp products.

3.    Plaintiff has been supplying pulp products to the Defendant for more than twenty (20) years.

4.    On multiple occasions during their business relationship, representatives of the Defendant have visited the Plaintiff's mill in Jesup to discuss pricing, performance allowances,

freight rates, review of the Jesup mill production process, and/or other matters pertaining to the negotiation of existing and/or future contracts.

5.      Defendant transmits all its orders for products from Plaintiff to Plaintiff's Marketing and Research Center, located in Jesup, Wayne County, Georgia.

6.      All orders from Defendant are accepted and confirmed by Plaintiff at its Marketing and Research Center, located in Jesup, Wayne County, Georgia.

7.      Plaintiff produces all of the pulp for the Defendant at its pulp mills in Jesup, Georgia, and Fernandina Beach, Florida.

8.      Pursuant to a Cellulose Specialities Agreement entered into between the parties (hereinafter referred to as the "Contract"), the Defendant reserved the right to audit and inspect the Plaintiff's records, located in Jesup, Wayne County, Georgia, to verify the correctness of the Plaintiff's calculation of changes and the weighted average price. A copy of the Contract is attached hereto as Exhibit "1."

9.      Pursuant to the General Terms of Sale, attached as Exhibit A to the contract, the contract entered into between the parties is to be interpreted and construed in accordance with the laws of the State of Georgia.

10.     The Defendant, having transacted business within the State of Georgia, is subject to the jurisdiction of this Court under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91, and may be served at R/N 704, 7th Fl., 142, Sec. 2, Chang-An E. Rd., Taipei, Taiwan, R.O.C., Telephone (886)2-27513516.

11.     Venue is proper in this Court pursuant to O.C.G.A. § 9-10-93.

## BREACH OF CONTRACT

12.    Plaintiff and Defendant entered the Contract that is the subject matter of this litigation on or about April 7, 2008.

13.    Pursuant to the Contract, the Defendant agreed to purchase a minimum amount of pulp products from the Plaintiff for the years 2008 through 2012.

14.    Specifically, Defendant agreed to purchase from Plaintiff during the period of 2009 through 2012 a minimum of 3,500 air-dry metric tons of Ultranier-J wood pulp and 3,500 air-dry metric tons of Amelianier-F wood pulp each calendar year.

15.    Pursuant to the Contract, the volume was to be spread in approximate equal quarterly shipments.

16.    To date for the calendar year 2009, the Defendant has purchased no Ultranier-J and no Amelianier-F as required by the Contract.

17.    The Defendant's failure to purchase Ultranier-J and Amelianier-F as required by the Contract constitutes a breach of the Contract and has damaged the Plaintiff.

18.    Pursuant to paragraph 4 of the Contract, the 2009 formula price sets forth the amount the Defendant owes Plaintiff for the amount of pulp product that Defendant should have purchased for the first quarter of 2009, as well as for the remainder of 2009.

19.    The Defendant is also obligated to purchase a minimum amount of pulp products from the Plaintiff for the calendar years 2010, 2011, and 2012.

20.    The Defendant has informed the Plaintiff that it does not intend to purchase any more pulp products at the prices stated under the Contract and desires to break the Contract.

21.    Because the Defendant has not purchased any pulp products as required by the Contract for 2009 and has stated it has no intention of purchasing pulp products at the agreed upon prices for the remainder of the term of the Contract, the Defendant has breached the Contract for years 2009, 2010, 2011, and 2012.

22.    Because the Defendant has breached its Contract with Plaintiff, the Plaintiff is entitled to recover all minimum amounts that should have been purchased by the Defendant pursuant to the terms of the Contract.

23.    The Defendant's failure to purchase the required minimum pulp products under the Contract constitutes a breach of the Contract for which the Plaintiff is entitled to recover damages.

24.    As a result of the Defendant's breach of the Contract, the Plaintiff is entitled to recover all reasonable attorney's fees, expenses, and costs associated with the Plaintiff having to file this action and attempt to collect monies owed pursuant to the Contract.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a)    For damages for breach of contract calculated pursuant to the terms of the Contract;

(b)    For attorney's fees and expenses incurred by Plaintiff in enforcing the terms of the Contract;

(c)    For judgment for the costs of this action;

(d)    For trial by a jury of twelve; and

(e)    For such other and further relief as the Court may deem just and proper.

Respectfully submitted, this 22nd day of April, 2009.


_____

JAMES B. DURHAM
Georgia State Bar No. 235526
AUDRA L. RIZZI
Georgia State Bar No. 607575
Attorneys for Plaintiff

DURHAM, McHUGH & DUNCAN, P.C.
Post Office Box 2177
Brunswick, Georgia 31521-2177
(912)264-1800

## CELLULOSE SPECIALTIES AGREEMENT

**RAYONIER PERFORMANCE FIBERS, LLC**, 4474 Savannah Hwy., Jesup, Georgia 31545 ("Rayonier") agrees to sell, and **MING TAI CHEMICAL CO., LTD.**, Room 704 Union Building, 7th Floor, 142 Sec. 2, Chang An E. Road, Taipei, Taiwan, Republic of China ("Buyer"), agrees to purchase the Products described below, subject to the terms and conditions stated in this Cellulose Specialties Agreement ("Agreement").

1. **PRODUCT(S)**: Rayonier Ultranier-J, Amelianier-F and other mutually agreed-upon grades of chemical cellulose consistent with Rayonier's standard specifications ("Product").

2. **TERM**: This Agreement is effective as of January 1, 2008, and shall continue in full force and effect through December 31, 2012.

3. **QUANTITY AND DELIVERIES**: In 2008 Buyer agrees to purchase a minimum 2,625 air-dry metric tons (ADMT) of Ultranier-J, and 3,500 ADMT of Amelianier-F. During the period 2009 through 2012 Buyer agrees to purchase a minimum 3,500 ADMT of Ultranier-J per year and 3,500 ADMT of Amelianier-F per year. Volume will be spread in approximate equal quarterly shipments. Shipment of Amelianier-F will commence after January 1, 2008. Shipment of Ultranier-J will commence after April 1, 2008

4. **PRICE AND TERMS**: The price of Product hereunder is $1550/ADMT for Ultranier-J for 2008 and $1440/ADMT for Amelianier-F for 2008. Terms are: CIF Taoyuan net 60 days from Bill of Lading date. The specific quantities, grades, and delivery dates of each individual shipment will be agreed upon between the parties thirty days prior to date of shipment and set forth in Rayonier's Pulp Sales Contract applicable to such shipment; such Pulp Sales Contract shall serve as order confirmation only and shall not alter the terms of this Agreement.

   The price for 2009 will be determined as follows: by December 1, 2008 Rayonier will inform Buyer of the estimated price for 2009. This estimated price will be used for all invoices to Buyer in 2009. By January 31, 2010 Rayonier will compare the estimated 2009 price to the 2009 Formula Price (as hereinafter defined). If the estimated 2009 price exceeds the 2009 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2009 price is less than the 2009 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2009 Formula Price" for each Product grade is the sum of Buyer's 2008 price plus the change in Rayonier's Weighted Average Price (the "WAP" as hereinafter defined) from 2008 to 2009.

   The price for 2010 will be determined as follows: by December 1, 2009 Rayonier will inform Buyer of the estimated price for 2010. This estimated price will be used for all invoices to Buyer in 2010. By January 31, 2011 Rayonier will compare the estimated 2010 price to the 2010 Formula Price (as hereinafter defined). If the estimated 2010

price exceeds the 2010 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2010 price is less than the 2010 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2010 Formula Price" for each Product grade is the sum of Buyer's 2009 Formula Price plus the change in WAP from 2009 to 2010.

The price for 2011 will be determined as follows: by December 1, 2010 Rayonier will inform Buyer of the estimated price for 2011. This estimated price will be used for all invoices to Buyer in 2011. By January 31, 2012 Rayonier will compare the estimated 2011 price to the 2011 Formula Price (as hereinafter defined). If the estimated 2011 price exceeds the 2011 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2011 price is less than the 2011 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2011 Formula Price" for each Product grade is the sum of Buyer's 2010 Formula Price plus the change in WAP from 2010 to 2011.

The price for 2012 will be determined as follows: by December 1, 2011 Rayonier will inform Buyer of the estimated price for 2012. This estimated price will be used for all invoices to Buyer in 2012. By January 31, 2013 Rayonier will compare the estimated 2012 price to the 2012 Formula Price (as hereinafter defined). If the estimated 2012 price exceeds the 2012 Formula Price, Rayonier shall issue a credit memo to Buyer for the difference. If the estimated 2012 price is less than the 2012 Formula Price, Rayonier shall issue a debit memo to Buyer for the difference. Any credit/debit memo shall be paid by Rayonier or Buyer, as applicable, to the other party within thirty (30) days of Rayonier's issuance of the memo. The "2012 Formula Price" for each Product grade is the sum of Buyer's 2011 Formula Price plus the change in WAP from 2011 to 2012.

For purposes of this Agreement, "WAP" is the delivered sales price less surcharges, rebates, allowances, and freight divided by the total sales volume for all Rayonier acetate pulp sales in any calendar year.

5. **AUDIT RIGHTS:** For prices in 2009 through 2012, Buyer shall have reasonable audit rights regarding the calculation of changes in WAP. Specifically, Buyer may inspect Rayonier's records (via a mutually agreed-upon accounting firm, such agreement upon the accounting firm shall not to be unreasonably withheld or delayed) to verify the correctness of Rayonier's calculations of changes in WAP. The accounting firm making such inspection shall be required to sign a reasonable confidentiality agreement provided by Rayonier and shall report only that Rayonier is in compliance with the pricing mechanism, and if not, the amount of such discrepancy in price. Upon receipt by Rayonier of an accurate report showing such discrepancy, Rayonier shall revise the applicable price charged to Buyer so that such discrepancy no longer exists. Buyer

shall be solely responsible for all expenses associated with such audit, provided, however, that in the event the accounting firm determines there is a discrepancy in Rayonier's calculation of the WAP for any year, and if the aggregate Formula Price for all Product shipped to Buyer during such year, after Rayonier issues any credit/debit memo, exceeds by one percent (1%) the aggregate price that should have been paid for said Product as determined by the accounting firm for said years, Rayonier shall be responsible for the accounting firm's expenses associated with the audit for such period.

6.  **ANNUAL VOLUME REBATE:** Provided Buyer is not in default under this Agreement, Rayonier shall pay Buyer a rebate based upon total aggregate volume purchased as follows:

In 2008 Rayonier shall advance a volume discount of $180/ADMT to Buyer on each invoice based on the assumption that Buyer purchases at least 2,625 ADMT of Ultranier-J, and 3,500 ADMT during 2008. For 2009 through 2012 Rayonier shall advance a volume discount of $180/ADMT to Buyer on each invoice based on the assumption that Buyer purchases at least 3,5000 ADMT of Ultranier-J, and 3,500 ADMT of Amelianier-F per year.

At the end of each year, an adjustment shall be made if the actual volume purchased is less than this amount and Buyer will reimburse Rayonier for any overpayment of rebates by January 31, of the following year.

7.  **CONSTRUCTION OF AGREEMENT:** This Agreement, and all sales of Product made pursuant hereto, are subject to the General Terms of Sale set forth in Exhibit A, all of which are included herein and by reference made a part hereof. The parties anticipate that either Buyer or Rayonier may employ as an administrative matter purchase orders, order confirmations, contracts of sale or other forms which incorporate other provisions which by their terms purport to apply to a sale hereunder. The parties expressly stipulate that only this Agreement shall govern, and that no provisions in any such form shall apply to a sale hereunder, except to confirm an order or identify a specific shipment. This Agreement may be altered or added to only by express agreement in writing signed by Buyer and Rayonier, and no such agreement shall be implied by any act of shipment or acceptance of chemical cellulose.

**MING TAI CHEMICAL CO., LTD**

By: _Hsing Den Chen_
Name:
Title:  Mark H. Chen
        President
        April 07, 2008

**RAYONIER PERFORMANCE FIBERS, LLC**

By: _____
Name: Paul G. Boynton
Title:  Sr. V. P., Performance Fibers
        and Wood Products

Exhibit A

# Rayonier

## GENERAL TERMS OF SALE

(1) **TITLE; DEFINITION OF "PORT OF ENTRY:"** Unless contrary provisions specifically referring to title and/or risk of loss are set forth in the Agreement to which these General Terms of Sale are attached as an exhibit or on the face of any Pulp Sales Contract entered into pursuant thereto, title and risk of loss or damage to all products deliverable hereunder, including Wood Pulp and Chemical Cellulose (hereinafter for convenience called "Cellulose") shall pass to the Buyer, regardless of time, terms or method of payment and without diminution or release of Seller's security interest therein: (i) in the event the terms of sale specified in the applicable Pulp Sales Contract are F.O.B., upon tender of delivery by Seller aboard common carrier at such F.O.B. location; (ii) in the event the terms of sale specified in the applicable Pulp Sales Contract are C. & F., when the relevant shipment is loaded on board the carrying vessel at the Port of Exit; (iii) in the event the terms of sale specified in the applicable Pulp Sales Contract are C.I.F., when the vessel carrying the relevant shipment arrives dockside at the Port of Entry; (iv) in the event the terms of sale specified in the applicable Pulp Sales Contract are Free Terminal, when the relevant shipment is delivered inside such terminal; or (v) in the event the terms of sale specified in the applicable Pulp Sales Contract are F.A.S., upon delivery alongside the carrying vessel at the Port of Exit identified in such terms or on a dock designated and provided by the Buyer at such Port of Exit. As used in these General Terms, "Port of Entry" means the port outside of the United States of America at which the carrying vessel actually docks for purposes of unloading the Cellulose, regardless of whether such port is identified in the C.I.F. terms on the applicable Pulp Sales Contract.

(2) **WEIGHT:** In case of Cellulose "Ton" means "Metric Ton" 1,000 kgs. on an airdry basis (i.e., 90% bone-dry Cellulose by weight and 10% moisture) and usual packaging materials.

(3) **SHIPPING COST AND TAXES:** Unless the terms of sale specified in the applicable Pulp Sales Contract are C.I.F., Buyer shall pay all insurance costs, and, unless the terms of sale specified in the applicable Pulp Sales Contract are C.I.F. or C. & F., the Buyer shall pay all freight or other shipping costs of any shipment beyond the point at which title passes as specified in paragraph (1). In the event the Buyer's location to which the Cellulose is being shipped is located in the United States of America or Canada, the Buyer shall also pay any sales, use, excise or other tax, imposed or increased by Federal, State, Provincial or other taxing authority (except income, excess profits or social security taxes) resulting in an increase in cost to the Seller above that in effect at the date of the fixing of the price of such shipment. In the event the Buyer's location to which the Cellulose is being shipped is located outside of the United States of America or Canada, the Buyer shall pay all present and future charges after arrival of any shipment at Port of Entry, including, but not limited to, all warehouse charges, import duties, consular fees and charges, tariff charges and taxes imposed by any taxing authority in the Port of Entry or country of destination.

(4) **QUANTITY:** A maximum margin of 10%, more or less, on the quantities shipped is to be allowed for convenience of arranging freighting.

(5) **CLAIMS:** In the event the Buyer's location to which the Cellulose is being shipped is located in the United States of America or Canada, all claims relating to any shipment must be made in writing within two (2) months after arrival of shipment at destination and in no event later than three (3) months after date of shipment from Seller's mill. In the event the Buyer's location to which the Cellulose is being shipped is located outside of the United States of America or Canada, all claims relating to any shipment must be made in writing within three (3) months after arrival of the shipment at Port of Entry. A reasonable quantity of such shipment shall be held intact by Buyer pending examination. No defect or nonconformity in any shipment or installment shall excuse the Buyer from accepting and paying for any shipment or installment as to which no defect or nonconformity shall exist; but the Seller, at its option, may treat default in payment for any shipment or installment as a breach of the entire Agreement to which these General Terms of Sale are attached as an exhibit or as a breach of any Pulp Sales Contract entered into pursuant thereto and pursue its rights as described and referred to in paragraph 10.

(6) **TESTS:** In the event of a dispute as to the moisture content of any Cellulose, a retest shall be made in accordance with the procedures for the "Boring Method" as set forth in "Weighing, Sampling and Testing Pulp for Moisture", Publication T 210 M-86 of the Technical Association of the Pulp and Paper Industry, as revised and corrected in 1986. The Buyer shall, however, pay the invoice for the Cellulose in full, when due, subject to the result of the retest. If the difference in moisture between that described herein or in the applicable Pulp Sales Contract on the one hand and that determined by retesting on the other hand does not exceed 1% moisture, the cost of retesting shall be borne by the Buyer; otherwise, an appropriate adjustment shall be made to the invoice in accordance with the results of the retests and the Seller shall bear the cost of the retest.

(7) **SELLER'S LIABILITY:** Seller warrants that the Cellulose shall comply with the description set out in the applicable Pulp Sales Contract, **BUT MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.** Seller's liability hereunder shall in any case be limited to not exceed the purchase price of the particular delivery giving rise to a claim by the Buyer. Seller shall not be liable for any special, incidental, indirect, punitive or consequential damages, including, but not limited to, loss of use, or loss of profit, breach of contract between Buyer and any third party, negligence or any other cause of action, nor for cost of litigation related thereto.

(8) **CONTINGENCIES:** In the event of any contingency preventing or substantially interfering with the production, shipment or delivery of the products deliverable hereunder, including but not limited to such contingencies as fire, accident, sabotage, act of war or of public enemy, uprising, riot, restraint by any government, regulation, rule or order (whether or not actually valid) of any governmental agency or authority, the fixing of price ceilings on any products deliverable hereunder by a governmental agency or authority below prices agreed to for such products by the Seller and the Buyer, strike, sitdown, lockout, labor dispute, shortage of labor, fuel, power or raw materials, embargo, restriction or scarcity of transportation facilities, act of God or other cause beyond the control of either party, restrictions as to contracts, materials and shipping, and allocations or priorities, the Seller shall be under no obligation during such contingency to make shipments if the contingency shall be one immediately affecting the Seller and the shipments which otherwise would have been made during such period shall be canceled unless the Buyer and Seller otherwise mutually agree. If the contingency shall be one immediately affecting the Buyer, the Buyer shall be under no obligation during the period thereof to accept shipments except such as have been delivered to common carrier prior to the receipt by the Seller of notice from the Buyer of such contingency. If any such contingency shall cause only partial interruption, shipments and acceptances thereof shall be correspondingly reduced. In case of any shortage of the Seller's supply of products deliverable hereunder or transportation by reason of any such contingency, the Seller may distribute its production and supply among its customers in such proportions and among such of its customers as the Seller, in its discretion, may determine. Upon the termination of any such contingency, the obligation of the parties hereunder shall (except as herein otherwise provided) again become fully effective with respect to products, the date for shipment of which have not passed.

(9) **SOURCE OF SHIPMENT:** Seller reserves the right at all times to determine or change the mill or mills of Seller, or of its subsidiaries, from which shipments may be made of products deliverable hereunder.

(10) **DEFAULTS:** If the Buyer shall be in default for fifteen (15) days in payment due, or if the Buyer shall default in the performance of any other obligation, term or condition hereof, of the Agreement to which these General Terms of Sale are attached as an exhibit

or of any Pulp Sales Contract entered into pursuant thereto, or if the Buyer or the Seller shall become insolvent, admit in writing its inability to pay its debts as they mature, file a petition in proceedings in bankruptcy or insolvency or for reorganization or liquidation or relief under any bankruptcy, insolvency or debtor laws, make an assignment for the benefit of creditors, consent to the appointment of a receiver of it or of any substantial part of its property, be adjudicated a bankrupt or insolvent on a petition filed against it in bankruptcy or under insolvency or debtor laws, or if an order shall be made by any court appointing a receiver of either Buyer or Seller or of any substantial part of the property of either, or if any court shall assume custody or control of either the Buyer or Seller or of any substantial part of the property of either; then, and in any such event, the non-defaulting party may, at its option, without demand or notice of any kind and without prejudice to any other remedies afforded it under the Uniform Commercial Code, under any other applicable law or otherwise, either suspend performance hereunder during the continuance of such event (in which event, if the non-defaulting party elects, the Agreement to which these General Terms of Sale are attached as an exhibit and/or any Pulp Sales Contract entered into pursuant thereto shall be deemed extended for a period of time equal to that during which performance has been suspended) or terminate the Agreement to which these General Terms of Sale are attached as an exhibit, any Pulp Sales Contract entered into pursuant thereto and/or any other contracts with the defaulting party without prejudice to any right of action for damages against the defaulting party.

(11)  **ASSIGNMENT:**  The agreement to which these General Terms of Sale are attached as an exhibit and each Pulp Sales Contract entered into pursuant thereto shall bind the respective successors and assigns of the parties thereto, but none of Buyer's rights or obligations thereunder may be assigned without the Seller's prior written consent, except to a subsidiary or affiliated corporation of the Buyer, provided that such assignment shall not relieve the assignor of its obligation thereunder.  Any such assignment without the Seller's written consent shall be void.

(12)  **SEVERABILITY:**  If any provision herein is or becomes invalid or illegal in whole or in part, such provision shall be deemed amended, as nearly as possible, to be consistent with the intent expressed herein, in the Agreement to which these General Terms of Sale are attached as an exhibit, and any applicable Pulp Sales Contract entered into pursuant thereto, and if such is impossible, that provision shall fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal.

(13)  **NOTICE:**  Any notice shall be sufficiently given when duly mailed, registered or certified mail, return receipt requested, postage prepaid, addressed to Seller at 4470 Savannah Highway, P.O.Box 2070, Jesup, Georgia 31598, U.S.A., Attention: Vice President, Pulp Marketing, and to Buyer at its address appearing in the Agreement to which these General Terms are attached as an exhibit, or to such other address for either party as that party may by proper notice designate.

(14)  **GOVERNING LAWS:**  These General Terms of Sale, the Agreement to which they are attached as an exhibit and each Pulp Sale Contract entered into pursuant thereto shall be interpreted and construed in accordance with the laws of the State of Georgia, U.S.A. The application of the U.N. Convention on Contracts for the International Sale of Goods is expressly excluded.

(15)  **COMPLIANCE WITH FEDERAL LAW:**  When producing in the United States of America the products deliverable under the Agreement to which these General Terms of Sale are attached as an exhibit and any Pulp Sale Contract entered into pursuant thereto, the Seller shall comply with the Fair Labor Standard Act of 1938, as amended, and Title VII of the Civil Rights Act of 1964, as amended.

(16)  **DELAY NO CAUSE FOR REFUSAL:**  Notwithstanding anything contained herein, in the event of a carrier or vessel being delayed in arriving at Buyer's location to which the Cellulose is being shipped or to any foreign Port of Entry, through no fault of Seller, beyond the estimated time of arrival (ETA), such delay shall not by itself constitute a cause for refusal of the shipment by the Buyer.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the foregoing pleading, by depositing same in the United States mail with adequate postage thereon to assure delivery to:

James B. Durham, Esquire
Audra L. Rizzi, Esquire
DURHAM, McHUGH & DUNCAN, P.C.
Post Office Box 2177
Brunswick, GA 31521-2177

This _____ day of December, 2009.

BROWN, READDICK, BUMGARTNER
CARTER, STRICKLAND & WATKINS, LLP

_____
G. Todd Carter
Georgia Bar Number: 113601
**Attorney for Defendant Ming Tai Chemical Co.,
Ltd.**

5 Glynn Avenue
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX
tcarter@brbcsw.com

NOTICE OF REMOVAL                                        Page - 5 -